*In re* MCI TELECOMMUNICATIONS COMPLAINT

(AMERITECH MICHIGAN v PUBLIC SERVICE COMMISSION)

(AT&T COMMUNICATIONS OF MICHIGAN v AMERITECH MICHIGAN)

Docket Nos. 198706, 199383. Submitted October 14, 1997, at Lansing. Decided May 19, 1998, at 9:15 A.M. Leave to appeal granted, 459 Mich ___.

MCI Telecommunications Corporation filed a complaint in the Public Service Commission in July 1992 against Ameritech Michigan, alleging violations of the Michigan Telecommunications Act, 1991 PA 179, MCL 484.2101 *et seq.*; MSA 22.1469(101) *et seq.*, effective January 1, 1992, to January 1, 1996, relative to Ameritech's failure to provide 1 + intraLATA toll dialing parity, i.e., a dialing arrangement for long distance telephone calls within local access transport areas where "1" plus the seven-digit number to be called is dialed regardless of whether the intraLATA toll service provider is a local exchange carrier like Ameritech or is an interexchange carrier like MCI. The Attorney General and AT&T Communications of Michigan, Inc., intervened in the proceedings. Although it found no violation of Act 179, the PSC decided that intraLATA toll dialing parity was in the public interest and, in February 1994, ordered Ameritech to implement intraLATA toll dialing parity in Michigan no later than January 1, 1996. In July 1994, the PSC denied a motion for a rehearing and reconsideration of its February 1994 order. In March 1995, the PSC ordered Ameritech to begin implementing intraLATA toll dialing parity on January 1, 1996, in those offices in which it was technically possible to do so and to adopt a firm schedule for converting to intraLATA toll dialing parity for those offices in which it was not technically possible to do so by January 1, 1996. The PSC also required that a fifty-five percent discount on access charges paid by interexchange carriers be imposed for those offices that did not meet the schedule for converting to intraLATA toll dialing parity.

The Legislature enacted 1995 PA 216, effective November 30, 1995, MCL 484.2101 *et seq.*; MSA 22.1469(101) *et seq.*; adding to the Michigan Telecommunications Act §§ 312a and 312b, both of which addressed the implementation of intraLATA toll dialing parity in

Michigan. Section 312a was enacted with a repeal date of January 1, 2001, and § 312b was enacted with a repeal date of July 1, 1997.

The United States Congress enacted § 271 of the Federal Communications Act of 1996, 47 USC 271, effective February 8, 1996, which addressed Ameritech's and the other regional Bell operating companies' implementation of intraLATA toll dialing parity and entry into the interLATA long distance business. In a 1982 consent decree in federal court, American Telephone & Telegraph Company had agreed to divest itself of its local operating companies to settle an antitrust action by the federal government. Under the consent decree, the Bell operating companies were denied entry into the interLATA long distance business.

In May 1996, MCI and AT&T Communications of Michigan sought to have the PSC compel Ameritech to comply with the PSC's previous orders concerning the implementation of intraLATA toll dialing parity in Michigan. The PSC, in a June 1996 decision, reaffirmed its 1994 and March 1995 orders requiring intraLATA toll dialing parity and the fifty-five percent discount on access charges, determining those orders to be unimpeded by §§ 312a and 312b of the Michigan Telecommunications Act. In October 1996, the PSC denied Ameritech's motion for a rehearing. Ameritech appealed to the Court of Appeals (Docket No. 198706).

AT&T Communications of Michigan and MCI brought an action for mandamus against Ameritech in the Ingham Circuit Court, seeking to have the court compel Ameritech to comply with the PSC's orders. The court, William E. Collette, J., issued the requested writ of mandamus. Ameritech appealed to the Court of Appeals, which consolidated this appeal and Ameritech's appeal from the October 1996 PSC order denying rehearing (Docket No. 199383).

The Court of Appeals *held:*

The intraLATA toll dialing parity implementation schedule contained in the 1994 and March 1995 orders of the PSC was rendered void to the extent that this schedule conflicted with the implementation schedule contained in § 312b of the Michigan Telecommunications Act and continues to conflict with the schedule contained in § 312a of that act. In its 1996 orders, the PSC unlawfully or unreasonably required Ameritech to comply with a void implementation schedule and unlawfully or unreasonably imposed a fifty-five percent discount on access charges because of Ameritech's failure to comply with the void implementation schedule. The 1996 orders of the PSC and the grant of mandamus by the circuit court must be reversed.

1. The plain and unambiguous language of §§ 312a and 312b requires Ameritech to provide intraLATA toll dialing parity to no

more than ten percent of its customers after January 1, 1996, as long as Ameritech is prohibited from providing interLATA service. The PSC erred in determining that the Legislature had not intended to link intraLATA toll dialing parity with interLATA relief.

2. For purposes of § 271 of the Federal Telecommunications Act, §§ 312a and 312b, enacted as effective on November 30, 1995, are state orders issued by December 19, 1995, requiring a Bell operating company to implement intraLATA toll dialing parity such that they come within the grandfather clause and are excepted from the prohibition of § 271 against a state requiring a Bell operating company to implement intraLATA toll dialing parity before the earlier of when the Bell operating company is granted authority under § 271 to provide interLATA service or February 8, 1999.

Reversed.

1. TELECOMMUNICATIONS — MICHIGAN TELECOMMUNICATIONS ACT — INTRALATA Toll Dialing Parity.

Sections 312a and 312b of the Michigan Telecommunications Act—which govern a local exchange carrier's provision of intraLATA toll dialing parity, i.e., the same dialing procedure for a long distance call within a local access transport area regardless of whether the toll service provider is the local exchange carrier or is an interexchange carrier—indicate legislative intent to link the required provision of intraLATA toll dialing parity with the local exchange carrier's allowed entry into the interLATA long distance business (1995 PA 216; MCL 484.2312a, 484.2312b; MSA 22.1469[312a], 22.1469[312b]).

2. TELECOMMUNICATIONS — FEDERAL TELECOMMUNICATIONS ACT — MICHIGAN TELECOMMUNICATIONS ACT — INTRALATA Toll Dialing Parity.

Sections 312a and 312b of the Michigan Telecommunications Act are, for purposes of the Federal Telecommunications Act of 1996, state orders entered before December 19, 1995, for the implementation by a Bell operating company of intraLATA toll dialing parity, i.e., the same dialing procedure for a long distance call within a local access transport area regardless of whether the toll service provider is the Bell operating company or is an interexchange carrier; as such orders, they come within the grandfather clause exception to the prohibition in the Federal Telecommunications Act against a state requiring a Bell operating company to implement intraLATA toll dialing parity before the earlier of when the Bell operating company is granted authority under the Federal Telecommunications Act to provide interLATA long distance service or February 8, 1999 (47 USC 271; MCL 484.2312a, 484.2312b; MSA 22.1469[312a], 22.1469[312b]).

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Joseph A. Fink, Peter H. Ellsworth, Jeffery V. Stuckey,* and *Michael Gadola*), *Michael A. Holmes,* and *Ault & Maier, P.C.* (by *James A. Ault*), for Ameritech Michigan.

*Don L. Keskey, David A. Voges,* and *Henry J. Boynton,* Assistant Attorneys General, for Public Service Commission.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *J. Peter Lark,* Assistant in Charge, and *Orjiakor N. Isiogu,* Assistant Attorney General, for Attorney General.

*Dykema Gossett PLLC* (by *Albert Ernst, William J. Perrone,* and *David T. Arlington*), (*William Single, IV,* of Counsel), for MCI Telecommunications Corporation.

*Fischer, Franklin & Ford* (by *George Hogg, Jr., Arthur J. LeVasseur,* and *Sidney M. Berman*), *Joan Marsh,* and *Larry Salustro,* for AT&T Communications of Michigan, Inc.

Before: YOUNG, JR., P.J., and MARKMAN and SMOLENSKI, JJ.

SMOLENSKI, J. In Docket No. 198706 of these consolidated appeals, Ameritech Michigan appeals as of right an October 1996 order of the Public Service Commission that denied Ameritech's petition for a rehearing of a June 1996 PSC order. In Docket No. 199383, Ameritech appeals as of right a November 1996 circuit court order issuing a writ of mandamus. In both appeals, the PSC, the Attorney General, MCI Telecom-

munications Corporation, and AT&T Communications of Michigan, Inc., respond as appellees. We reverse.

I

This case concerns whether Ameritech is required to provide "intraLATA toll dialing parity" in the absence of "interLATA relief."

Before 1982, American Telephone and Telegraph Company, a provider of both local and long distance telephone service, dominated the telecommunications industry.[1] The key to AT&T's domination was its control of local telephone service.[2] AT&T provided local telephone service through its numerous Bell operating companies, one of which was Michigan Bell Telephone Company,[3] now doing business as Ameritech.

In 1982, AT&T agreed to the entry of a consent decree entitled "Modification of Final Judgment" in federal court (the AT&T consent decree). See, generally, *United States v American Telephone & Telegraph Co*, 552 F Supp 131 (D DC, 1982). For the purpose of ending AT&T's monopoly over local telephone service, the AT&T consent decree provided that AT&T would divest itself of its Bell operating companies.[4] The AT&T consent decree provided that the Bell operating companies would be authorized to provide telephone service only within certain defined geographic regions generally corresponding to telephone area code regions called "local access transport

---

[1] *United States v American Telephone & Telegraph Co*, 552 F Supp 131, 222 (D DC, 1982).

[2] *Id.*, n 1 at 223.

[3] *Id.*, n 2 at 139, n 19, 228, 232.

[4] *Id.*, n 3 at 141, 223, 226.

areas" [5] (LATAS).[6] This service, called intraLATA service, includes local calls, i.e., typically telephone calls within a city or town, as well as toll calls, i.e., calls covering a distance beyond local calls but within the same LATA (intraLATA toll calls).[7] However, the AT&T consent decree provided that the Bell operating companies were prohibited from providing interLATA service, i.e., telephone service between LATAS.[8] The AT&T consent decree further provided that the interLATA prohibition could be removed when a Bell operating company showed that there was no substantial possibility that it could use its monopoly power to impede competition in the market it sought to enter.[9] As a result, at least in part, of the AT&T consent decree, during the 1980s in Michigan a customer's intraLATA toll calls were carried by a local carrier such as Ameritech while a customer's interLATA calls were carried by an interexchange (long distance) carrier such as AT&T of Michigan or MCI.[10]

In the late 1980s, the PSC authorized AT&T of Michigan and MCI to begin competing in the Michigan intraLATA toll market.[11] However, in order for an interexchange carrier such as AT&T of Michigan or MCI to provide service for a customer's intraLATA toll call, the customer must dial a five-digit "10xxx" prefix to the

---

[5] *Id.* at 141, 224, 227; see also *Bell Atlantic-New Jersey, Inc v Tate,* 962 F Supp 608, 611 (D NJ, 1997); *United States v Western Electric Co, Inc,* 569 F Supp 990, 993-994 (D DC, 1983); *GTE North Inc v Public Service Comm,* 215 Mich App 137, 140; 544 NW2d 678 (1996).

[6] There are five LATAS in Michigan. *GTE North,* n 5 *supra.*

[7] *Bell Atlantic,* n 5 *supra;* see also *Western Electric,* n 5 *supra.*

[8] *AT&T Co, supra* at 227; see also *Bell Atlantic,* n 5 *supra; Western Electric,* n 5 *supra; GTE North,* n 5 *supra.*

[9] *AT&T Co, supra* at 195, 231.

[10] *Bell Atlantic,* n 5 *supra; GTE North,* n 5 *supra.*

[11] *GTE North,* n 5 *supra.*

number to be called, with the "xxx" being a three-digit identification code assigned to each inter-exchange carrier.[12] The PSC allowed local carriers such as Ameritech to retain the use of what is termed "1 +" or "0 +" dialing, meaning that Ameritech provides service for a customer's intraLATA toll call when the customer adds only a single digit prefix (either a "1" or "0") to the number to be called.[13]

These dialing arrangements are the root of this case. MCI and AT&T of Michigan do not like these dialing arrangements for intraLATA toll calls because they believe "1 +" and "0 +" dialing gives Ameritech a substantial competitive advantage in the intraLATA toll market. MCI and AT&T of Michigan want "intraLATA toll dialing parity," i.e., "uniform 1 + dialing arrangements for all intraLATA service by all providers . . . ."[14] However, Ameritech's position has always been that it should not be required to provide intraLATA toll dialing parity until it has been accorded "interLATA relief," i.e., the authority to compete in the interLATA market.

In July 1992, MCI commenced this proceeding in the PSC, U-10138, by filing a complaint alleging, in part, that Ameritech was violating various provisions of the Michigan Telecommunications Act, 1991 PA 179, MCL 484.2101 et seq.; MSA 22.1469(101) et seq. (Act 179 or the MTA), by failing to make intraLATA toll dialing parity available to MCI.[15] At some point, the Attorney General and AT&T of Michigan intervened in this proceeding. Although finding that Ameritech's failure to provide intraLATA toll dialing parity did not

---

[12] *Id.*, n 11 at 140-141.
[13] *Id.*, n 12 at 140.
[14] *Id.*, n 13 at 141.
[15] *Id.*, n 14 at 143.

violate Act 179, the PSC ultimately determined that
implementation of intraLATA toll dialing parity was in
the public interest and, in a February 1994 decision,
ordered Ameritech to implement intraLATA toll dialing
parity in Michigan "no later than January 1, 1996."[16]
The decision also provided that a task force would be
established to work out the procedures for imple-
menting intraLATA toll dialing parity.[17] Ameritech
moved for a rehearing and reconsideration, which
was denied by the PSC in a July 1994 decision.[18]

After the task force submitted a report to the PSC
containing certain recommendations and noting cer-
tain disputed issues, the PSC issued a March 1995 deci-
sion in which it ordered Ameritech to begin imple-
menting intraLATA toll dialing parity on January 1,
1996, in those offices in which it was technically pos-
sible to do so and to adopt a firm schedule for con-
verting to intraLATA toll dialing parity for those offices
in which it was not technically possible to do so by
January 1, 1996. The decision also provided that a
fifty-five percent discount on access charges would
be imposed on those offices that did not meet the
schedule for converting to intraLATA toll dialing parity.
Access charges apparently are paid by an inter-
exchange carrier such as AT&T of Michigan and MCI
to a local carrier such as Ameritech for the inter-

---

[16] *Id.*, n 15 at 144-149.

[17] *Id.*, n 16 at 150.

[18] *Id.*, n 17. Ameritech appealed the PSC's 1994 decisions, contending, in
part, that the PSC did not have the statutory authority under Act 179 to
order the implementation of intraLATA toll dialing parity. This Court
affirmed the PSC's 1994 decisions. *GTE North*, n 5 *supra* at 140. In particu-
lar, this Court found that the PSC did have the statutory authority under
Act 179 to order the implementation of intraLATA toll dialing parity. *Id.* at
153-154.

exchange carrier's use of the local carrier's local network during the initial and final link of an intraLATA toll call serviced by the interexchange carrier. In imposing the discount, the PSC rejected the contention that the discount was a penalty. The PSC reasoned that the discount was warranted because nonconverted access services whereby customers would have to continue to dial five-digit access codes plus the number to be called in order for an interexchange carrier to service an intraLATA toll call were of lesser quality than converted access services whereby an interexchange carrier would service the call simply when customers dialed a one-digit prefix plus the number to be called.[19]

Effective November 30, 1995, the Legislature enacted 1995 PA 216, MCL 484.2101 *et seq.*; MSA 22.1469(101) *et seq.* (Act 216 or the MTA), which substantially amended and added several new sections to the MTA. In particular, Act 216 added § 312a[20] and § 312b,[21] both of which specifically addressed[22] the implementation of intraLATA toll dialing parity in Michigan:

---

[19] Ameritech appealed the PSC's March 1995 decision, raising issues concerning the task force report, the fifty-five percent discount, and certain procedures adopted by the PSC for the implementation of intraLATA toll dialing parity. This Court subsequently affirmed. *Ameritech Michigan v Public Service Comm*, unpublished opinion per curiam of the Court of Appeals, issued February 7, 1997 (Docket Nos. 184718, 186602).

[20] MCL 484.2312a; MSA 22.1469(312a).

[21] MCL 484.2312b; MSA 22.1469(312b).

[22] The only express reference to intraLATA toll dialing parity found in Act 179 was a provision requiring the PSC to report to the Legislature and Governor by January 1, 1994, regarding the effect of implementing intraLATA toll dialing parity. 1991 PA 179, MCL 484.2202(f)(x); MSA 22.1469(202)(f)(x); *GTE North*, n 5 *supra* at 142.

Sec. 312a. Effective January 1, 1996, if a waiver to the inter-LATA prohibitions has been granted for a specific service area and the service area has 2 or more providers of local exchange service, the provider of basic local exchange service shall provide 1 + intra-LATA toll dialing parity within the service area that is subject to the waiver.

Sec. 312b. (1) Except as otherwise provided in subsection (2) or (3), a provider of basic local exchange service shall provide 1 + intra-LATA toll dialing parity and shall provide inter-LATA toll service to an equal percentage of customers within the same service exchange on the following dates:

(a) To 10% of the customers by January 1, 1996.

(b) To 20% of the customers by February 1, 1996.

(c) To 30% of the customers by March 1, 1996.

(d) To 40% of the customers by April 1, 1996.

(e) To 50% percent of the customers by May 1, 1996.

(2) If the inter-LATA prohibitions are removed, the commission shall immediately order the providers of basic local exchange service to provide 1 + intra-LATA toll dialing parity.

(3) Except for subsection (1)(a), subsection (1) does not apply to the extent that a provider is prohibited by law from providing either 1 + intra-LATA toll dialing parity or inter-LATA toll service as provided under subsection (1).

(4) Except as otherwise provided by this section, this section does not alter or void any orders of the commission regarding 1 + intra-LATA toll dialing parity issued on or before June 1, 1995.

(5) The commission shall immediately take the necessary actions to receive the federal waivers needed to implement this section.

(6) This section does not apply to a provider of basic local exchange service with less than 250,000 access lines.

Section 312a was enacted with a repeal date of January 1, 2001,[23] while § 312b was enacted with a repeal

---

[23] MCL 484.2604(1); MSA 22.1469(604)(1).

date of July 1, 1997.[24] The Legislature defined the statutory phrase "inter-LATA prohibitions" in relevant part to mean "the prohibitions on the offering of . . . inter-LATA service contained in the modification of final judgment entered pursuant to [the AT&T consent decree]."[25]

In response to the enactment of § 312b, Ameritech provided intraLATA toll dialing parity to only ten percent of its customers after January 1, 1996.

On February 8, 1996, Congress enacted § 271 of the Federal Telecommunications Act of 1996 (the FTA), 47 USC 271, which addresses a Bell operating company's implementation of intraLATA toll dialing parity and entry into the interLATA market in the following relevant respects:

> (a) General limitation. Neither a Bell operating company, nor any affiliate of a Bell operating company, may provide interLATA services except as provided in this section.
>
> \*          \*          \*
>
> (e) Limitations.
>
> \*          \*          \*
>
> (2) IntraLATA toll dialing parity.
>
> (A) Provision required. A Bell operating company granted authority to provide interLATA services . . . shall provide intraLATA toll dialing parity throughout that State coincident with its exercise of that authority.
>
> (B) Limitation. Except for single-LATA States and States that have issued an order by December 19, 1995, requiring a Bell operating company to implement intraLATA toll dialing parity, a State may not require a Bell operating company to

---

[24] MCL 484.2604(2); MSA 22.1469(604)(2).

[25] MCL 484.2102(l); MSA 22.1469(l), redesignated as MCL 484.2102(k); MSA 22.1469(102)(k), by 1998 PA 41.

implement intraLATA toll dialing parity in that State before a Bell operating company has been granted authority under this section to provide interLATA services originating in that State or before 3 years after February 8, 1996, whichever is earlier. Nothing in this subparagraph precludes a State from issuing an order requiring intraLATA toll dialing parity in that State prior to either such date so long as such order does not take effect until after the earlier of either such dates.

(f) Exception for previously authorized activities. Neither subsection (a) of this section nor section 273 of this title shall prohibit a Bell operating company or affiliate from engaging, at any time after February 8, 1996, in any activity to the extent authorized by, and subject to the terms and conditions contained in, an order entered by the United States District Court for the District of Columbia pursuant to section VII or VIII(C) of the AT&T consent decree if such order was entered on or before February 8, 1996, to the extent such order is not reversed or vacated on appeal. Nothing in this subsection shall be construed to limit, or to impose terms or conditions on, an activity in which a Bell operating company is otherwise authorized to engage under any other provision of this section.

The term "Bell operating company" is defined to include Michigan Bell Telephone Company. 47 USC 153(4). The term "AT&T consent decree" in § 271(f) is defined as an order entered pursuant to the decree entered in *AT&T Co*, *supra*. 47 USC 153(3). The phrase "[e]xcept for single-LATA States and States that have issued an order by December 19, 1995, requiring a Bell operating company to implement intraLATA toll dialing parity" in § 271(e)(2)(B) is known as the "Breaux-Leahy Amendment." *Bell Atlantic-New Jersey, Inc v Tate*, 962 F Supp 608, 613 (D NJ, 1997). The amendment was designed to avoid the generally preemptive effect of § 271(e)(2)(B) and allow states such as Michigan that had ordered intraLATA toll dialing parity by December 19, 1995, to proceed to effec-

tuate that requirement after that date. *Id.*; see also 141 Cong Rec, S 8349 (daily ed, June 14, 1995) (statement of Sen. Leahy). The amendment has also been referred to as a "grandfather clause." *Bell Atlantic, supra.*

In May 1996, MCI and AT&T of Michigan moved in the PSC to compel Ameritech to comply with the PSC's previous orders concerning full implementation of intraLATA toll dialing parity. Relying on the language in § 312b(4) that "this section does not alter or void any orders of the commission regarding 1 + intra-LATA toll dialing parity issued on or before June 1, 1995," MCI and AT&T of Michigan reasoned that the expiration of the January 1 to May 1, 1996, statutory phase-in schedule contained in § 312b(1) meant that the PSC's 1994 and March 1995 orders were once again fully effective and that the time frames for implementing intraLATA dialing parity set forth in those orders must now be met.

In response, Ameritech contended that § 312b constituted a statutory plan linking intraLATA toll dialing parity with interLATA relief. Ameritech cited § 312b(3) for the proposition that "unless and until" it was allowed to provide interLATA service, it was statutorily obligated to provide intraLATA toll dialing parity to only ten percent of its customers.

In a June 1996 decision, the PSC ordered Ameritech, within thirty days, to provide intraLATA toll dialing parity and implement the fifty-five percent discount on access charges pursuant to the PSC's 1994 and March 1995 orders. The PSC rejected Ameritech's contention that § 312b was intended to link intraLATA toll dialing parity with interLATA relief. The PSC accepted MCI's and AT&T of Michigan's contention that § 312b

was intended to provide only a partial and temporary reprieve from the PSC's conversion schedule. In so ruling, the PSC reasoned that § 312b was ambiguous. The PSC resolved the perceived ambiguity by considering the language of § 312b, its legislative history, and its practical effect.

With respect to the language of § 312b, the PSC noted that, had the Legislature intended to link intraLATA toll dialing parity with interLATA relief, it could have done so in either of two ways. First, the PSC noted that the absence of the operative phrase relied on by Ameritech ("unless and until") casts serious doubt on Ameritech's claim that the Legislature intended to indefinitely suspend the dialing parity conversion schedule once conversion reached ten percent. Second, the PSC noted that

> the phrase "no more than" could have been inserted before each of the numerical percentages found in subsections (1)(a) through (1)(e) of Section 312B [sic], thus clearly expressing that the maximum scope of dialing parity that Ameritech Michigan could be required to provide (at least until all federal prohibitions on providing interLATA toll service are lifted) was 50%. However, neither that nor any similar phrase was included in the Act. Therefore, the language in Section 312b(1), when given its plain meaning, appears to set a minimum, rather than a maximum, pace for Ameritech Michigan's conversion to dialing parity. This conflicts with Ameritech's interpretation of the Act.

The PSC also noted that the July 1, 1997, expiration of § 312b simply removed any doubt that one hundred percent intraLATA toll dialing parity was consistent with the Legislature's intent.

The PSC also found that the legislative history of § 312b did not support Ameritech's argument that the

Legislature intended to link intraLATA toll dialing parity with interLATA relief. In so finding, the PSC quoted part of an early Senate version of § 312a:

> Until the inter-LATA prohibitions are removed for providers of basic local exchange service, a provider of basic local exchange service is not required to provide 1 + intra-LATA toll dialing parity. If the inter-LATA prohibitions are removed, then a provider of basic local exchange service shall offer to other providers 1 + intra-LATA toll dialing parity. [SB 722, as passed by the Senate on October 26, 1995.]

The PSC found that the Legislature's failure to ultimately enact this language as part of § 312a and § 312b meant that the Legislature did not intend to absolutely link intraLATA dialing parity with interLATA relief. The PSC also noted:

> As initially written, Section 312b(4) retained the effectiveness of all Commission orders regarding dialing parity issued before June 30, 1995. See House Public Utility Committee substitute, H-1, to Senate Bill No. 722; 1995 Journal of the House 2651 (No. 82, November 7, 1995). However, that date was in conflict with the June 1, 1995 cut-off being considered by Congress in legislation that eventually became the federal Telecommunications Act of 1996. This created the possibility that the Commission's orders concerning dialing parity might not be considered "grandfathered" and that Michigan, like a majority of the states, would be precluded for up to three years from requiring Ameritech Michigan to implement dialing parity unless the company first received authority to provide interLATA toll service.
>
> To avoid that result, the language of Section 312b(4) was amended by replacing "June 30, 1995" with "June 1, 1995." *Id.* at 2654. In making that change, the Legislature ensured (1) that the removal of interLATA prohibitions would not become a condition precedent to requiring Ameritech Michigan to provide intraLATA dialing parity, and (2) that prior

Commission orders requiring the comprehensive implementation of dialing parity would not be overturned by the new federal law. The legislative history of Section 312b(4) thus supports the construction advocated by MCI and AT&T . . . .

Finally, the PSC noted that implementation of intraLATA dialing parity was in the public interest and that Ameritech's construction of § 312b conflicted with the MTA's goals of encouraging competition and new providers.[26]

Ameritech moved for a rehearing. In an October 1996 decision, the PSC denied rehearing and ordered Ameritech to immediately provide intraLATA toll dialing parity and implement the fifty-five percent discount on access charges in unconverted offices in accordance with the PSC's 1994, March 1995, and June 1996 orders.

In November 1996, Ameritech timely filed with this Court a claim of appeal from the PSC's October 1996 order (Docket No. 198706). That same day, AT&T Communications of Michigan and MCI filed a complaint against Ameritech in the circuit court, seeking a writ of mandamus compelling Ameritech to comply with the PSC's toll dialing parity orders. Following oral argument, but without considering the statutory language of § 312b or otherwise making any findings of fact or conclusions of law, the circuit court issued an order directing that the requested writ of mandamus be issued. The order directed Ameritech to comply with the PSC's intraLATA toll dialing parity orders in "conformance with the implementation schedule ordered by the Commission." Ameritech then filed a timely claim of appeal in this Court from the circuit

---

[26] See MCL 484.2101(2); MSA 22.1469(101)(2).

court's order (Docket No. 199383). In December 1996, this Court entered a stay of further proceedings in Docket No. 198706 (Ameritech's appeal of the PSC's October 1996 order) "pending resolution of this appeal or further order of this Court."[27] In January 1997, this Court consolidated Ameritech's appeals.

II

Ameritech contends that this Court must reverse the PSC's 1996 orders requiring full implementation of intraLATA toll dialing parity.[28]

---

[27] *Ameritech Michigan v Public Service Comm,* unpublished order of the Court of Appeals, entered December 4, 1996 (Docket No. 198706).

[28] We preliminarily note that AT&T of Michigan raises a challenge to the constitutionality of § 312b(1). We note that the PSC does not possess the power to determine the constitutionality of statutes. *In re Federal Preemption Of Provisions Of The Motor Carrier Act,* 223 Mich App 288, 303; 566 NW2d 299 (1997). Thus, in this case, the PSC did not decide the constitutional issue raised on appeal by AT&T of Michigan. Accordingly, there is no determination by the PSC for this Court to review with respect to this issue. *Id.* Moreover, direct challenges to the constitutionality of statutes belong in a different forum. *Id.* (citing *Universal Am-Can, Ltd v Attorney General,* 197 Mich App 34, 37-38; 494 NW2d 787 [1992]). Thus, we decline to address this issue. *In re Federal Preemption, supra.*

AT&T of Michigan also contends that in *GTE North* (this Court's decision affirming the PSC's 1994 orders in this case, see n 18, *supra*), this Court decided the issue of the effect of § 312b on the PSC's orders adversely to Ameritech. AT&T of Michigan contends that, therefore, this Court is bound by the law of the case with regard to this issue. The law of the case doctrine provides that a ruling by an appellate court with regard to a particular issue binds the appellate court and all lower tribunals with respect to that issue. *Reeves v Cincinnati, Inc (After Remand),* 208 Mich App 556, 559; 528 NW2d 787 (1995). Thus, a question of law decided by an appellate court will not be decided differently on remand or in a subsequent appeal in the same case. *Id.* The doctrine applies to questions specifically decided in an earlier decision and to questions necessarily determined to arrive at that decision. *Webb v Smith (After Second Remand),* 224 Mich App 203, 209; 568 NW2d 378 (1997). In this case, we find no indication in *GTE North* that the panel specifically decided the issue of the effect of § 312b on the PSC's 1994 orders or that the panel necessarily decided this issue in order to arrive at its decision. See, generally, *GTE North, supra.* Indeed, we note that in *Ameritech, supra* at slip op p 11,

Ameritech bears the burden of proving by clear and satisfactory evidence that the PSC's decisions were unlawful or unreasonable. MCL 462.26; MSA 22.45, MCL 484.2203(7); MSA 22.1469(203)(7); *Attorney General v Public Service Comm*, 227 Mich App 148, 153; 575 NW2d 302 (1997); *In re Procedure & Format For Filing Tariffs Under The Michigan Telecommunications Act*, 210 Mich App 533, 538; 534 NW2d 194 (1995). A decision of the PSC is unlawful when it involves an erroneous interpretation or application of law and unreasonable when it is unsupported by the evidence. *Consumers Power Co v Public Service Comm*, 226 Mich App 12, 21; 572 NW2d 222 (1997). Although statutory interpretation is a question of law subject to review de novo, this Court ordinarily will defer to the construction placed on statutory provi-

---

n 1 (this Court's decision affirming the PSC's March 1995 order in this case, see n 19, *supra*), this Court specifically stated as follows:

> The proceedings in *GTE North, supra,* were conducted pursuant to the *former* Michigan Telecommunications Act, 1991 PA 179, MCL 484.2101 *et seq.*; MSA 22.1469(101) *et seq.*, effective January 1, 1993 [sic], which repealed and replaced public acts of 1883 and 1913 regulating telephone service. 1991 PA 179 ultimately lapsed after the instant appeals were filed, pursuant to a "sunset" expiration date of January 1, 1996, set forth in § 604 of the act, MCL 484.2604; MSA 22.1469(604). In its place, the Legislature has now enacted a new Michigan Telecommunications Act, 1995 PA 216, which is also codified at MCL 484.2101 *et seq.*; MSA 22.1469(101) *et seq.* Because the briefing in these appeals were completed before the enactment of 1995 PA 216, the new statutory provisions are not discussed herein and any statutory citations in this opinion only refer to 1991 PA 179.

Thus, we reject AT&T of Michigan's law of the case argument.

Finally, AT&T of Michigan contends that in light of *GTE North*, this Court is precluded under the doctrine of res judicata or collateral estoppel from considering the issue of the effect of § 312b on the PSC's orders. We believe that AT&T of Michigan confuses these doctrines with the law of the case doctrine. Thus, we likewise decline to consider these issues.

sions by the governmental agency charged with applying them unless the agency interpretation is clearly wrong. *Attorney General, supra.* However, an agency's initial interpretation of new legislation is not entitled to the same measure of deference that we would accord a longstanding administrative interpretation. *In re Telecommunications Tariffs, supra.* But, "[m]erely establishing that another interpretation is plausible is not sufficient to meet the burden of establishing by clear and convincing evidence that the PSC's interpretation of the statute is unlawful or unreasonable." *Attorney General, supra* at 155.

Ameritech again argues, as it did below, that in enacting § 312b the Legislature unambiguously intended to prohibit, at least until July 1, 1997, the implementation of intraLATA toll dialing parity for more than ten percent of customers to the extent that Ameritech is prohibited by law from providing interLATA service. Ameritech contends that, to this extent, § 312b nullified the PSC's 1994 and 1995 orders requiring full implementation of intraLATA toll dialing parity. Ameritech argues that, accordingly, as of the December 19, 1995, date of the grandfather clause contained in § 271(e)(2)(B) of the FTA, there was no longer a valid PSC order for full intraLATA toll dialing parity. Ameritech contends that the PSC's 1996 orders are new orders that do not come with the grandfather clause contained in § 271(e)(2)(B) of the FTA. Ameritech argues that the PSC's 1996 orders are, therefore, preempted under § 271(e)(2)(B) of the FTA and must be reversed.

The PSC again contends that § 312b is ambiguous concerning the time when full intraLATA toll dialing parity is required. The PSC contends that it reasonably

construed § 312b as providing a temporary phase-in schedule that simply deferred until May 2, 1996, the PSC's order requiring implementation of full intraLATA toll dialing parity. The PSC contends that this Court should defer to the PSC's reasonable construction of § 312b. The PSC argues that its 1994 and 1995 orders, as modified by § 312b, are within the December 19, 1995, date contained in the grandfather clause in § 271(e)(2)(B) of the FTA. The PSC argues that its 1996 orders are not preempted by § 271(e)(2)(B) because they are simply ancillary orders requiring Ameritech to comply with its 1994 and 1995 orders. The Attorney General, MCI, and AT&T of Michigan essentially reiterate the PSC's arguments.

A

We first consider the issue of statutory construction raised by Ameritech.

The primary goal of statutory interpretation is to ascertain and give effect to the Legislature's intent. *Smith v Globe Life Ins Co*, 223 Mich App 264, 276; 565 NW2d 877 (1997). The first criterion in determining intent is the specific language of the statute. *House Speaker v State Administrative Bd*, 441 Mich 547, 567; 495 NW2d 539 (1993). The Legislature is presumed to have intended the meaning it plainly expressed. *Smith, supra.* If the plain and ordinary meaning of the statutory language is clear, then judicial construction is neither necessary nor permitted. *Id.* at 276-277. However, if reasonable minds can differ with respect to the meaning of a statute, judicial construction is appropriate. *Heinz v Chicago Rd Investment Co*, 216 Mich App 289, 295; 549 NW2d 47 (1996). "[S]tatutes that relate to the same subject mat-

ter should be read, construed, and applied together to distill the Legislature's intention . . . ." *Empire Iron Mining Partnership v Orhanen*, 455 Mich 410, 427; 565 NW2d 844 (1997). With these principles in mind, we turn to the plain language of those sections of the MTA that relate to the subject of intraLATA toll dialing parity, i.e., not only § 312b, but § 312a as well. We again set forth the text of these statutes below:

Sec. 312a. Effective January 1, 1996, if a waiver to the inter-LATA prohibitions has been granted for a specific service area and the service area has 2 or more providers of local exchange service, the provider of basic local exchange service shall provide 1 + intra-LATA toll dialing parity within the service area that is subject to the waiver.

Sec. 312b. (1) Except as otherwise provided in subsection (2) or (3), a provider of basic local exchange service shall provide 1 + intra-LATA toll dialing parity and shall provide inter-LATA toll service to an equal percentage of customers within the same service exchange on the following dates:

(a) To 10% of the customers by January 1, 1996.

(b) To 20% of the customers by February 1, 1996.

(c) To 30% of the customers by March 1, 1996.

(d) To 40% of the customers by April 1, 1996.

(e) To 50% percent of the customers by May 1, 1996.

(2) If the inter-LATA prohibitions are removed, the commission, shall immediately order the providers of basic local exchange service to provide 1 + intra-LATA toll dialing parity.

(3) Except for subsection (1)(a), subsection (1) does not apply to the extent that a provider is prohibited by law from providing either 1 + intra-LATA toll dialing parity or inter-LATA toll service as provided under subsection (1).

(4) Except as otherwise provided by this section, this section does not alter or void any orders of the commission regarding 1 + intra-LATA toll dialing parity issued on or before June 1, 1995.

> (5) The commission shall immediately take the necessary actions to receive the federal waivers needed to implement this section.
>
> (6) This section does not apply to a provider of basic local exchange service with less than 250,000 access lines.

We also again note that the Legislature specifically defined "inter-LATA prohibitions" to mean the prohibitions on interLATA service contained in the AT&T consent decree.

When these sections are construed together, we do not find the plain language of § 312a and § 312b to be ambiguous. Specifically, under § 312a, a local carrier must provide intraLATA toll dialing parity for a particular area "if a waiver to the inter-LATA prohibitions [contained in the AT&T consent decree] has been granted for a specific service area and the service area has 2 or more providers of local exchange service . . . ."

Under § 312b(1)(a) and (3), a local carrier has an unconditional obligation to provide intraLATA toll dialing parity and interLATA service[29] to ten percent of customers by January 1, 1996. Under § 312b(1)(b)-(e) and (3), the carrier has a further obligation to provide intraLATA toll dialing parity and interLATA service to

---

[29] We note that § 312b(1), repealed July 1, 1997, provided that a local carrier "*shall provide* 1 + intra-LATA toll dialing parity and *shall provide* inter-LATA toll service to an equal percentage of customers" as provided by the schedule contained in § 312b(1)(a)-(e). Ameritech concedes that since January 1, 1996, it has provided intraLATA toll dialing parity to ten percent of its customers even though it has been prohibited by either the AT&T consent decree or § 271 of the FTA from providing interLATA service to ten percent of its customers. Ameritech raises no issue with respect to its continued provision of intraLATA toll dialing parity to ten percent of its customers. Thus, we need not decide whether Ameritech's obligation to provide intraLATA toll dialing parity to ten percent of its customers under the schedule set forth in § 312b(1)(a) was independent of or dependent on Ameritech's ability to provide interLATA service to its customers.

twenty percent of customers by February 1, 1996, thirty percent of customers by March 1, 1996, forty percent of customers by April 1, 1996, and finally fifty percent of customers by May 1, 1996, unless the provider is prohibited by law from providing either intraLATA toll dialing parity or interLATA service in accordance with this schedule. Finally, under § 312b(2), the PSC shall immediately order a local provider to provide intraLATA toll dialing parity once "the inter-LATA prohibitions [contained in the AT&T consent decree] are removed . . . ."

Thus, we conclude from the plain language of these sections that, except for ten percent of customers, the Legislature intended that Ameritech provide intraLATA toll dialing parity when the conditions specified in § 312a and § 312b—primarily interLATA relief— were satisfied. Our conclusion in this regard is bolstered by § 312b(5), which provides that the PSC "shall immediately take the necessary actions to receive the federal waivers needed to implement [§ 312b]."

The PSC has focused on the language of § 312b(4):

> Except as otherwise provided by this section, this section does not alter or void any orders of the commission regarding 1 + intra-LATA toll dialing parity issued on or before June 1, 1995.

The PSC interprets § 312b(4) as affecting only the PSC's implementation schedule between January 1 and May 1, 1996, and contends that its orders requiring full implementation of intraLATA toll dialing parity were once again effective on May 2, 1996. However, § 312b(4) does not provide "[e]xcept as otherwise provided by subsection one" or "[e]xcept as otherwise provided by the schedule set forth in subsection one."

Rather, § 312b(4) provides "[e]xcept as otherwise provided by this section," this "section" being § 312b in its entirety. As explained above, under § 312b(1) and (3), Ameritech is required to provide intraLATA toll dialing parity to no more than ten percent of customers after January 1, 1996, as long as Ameritech is prohibited by law from providing either intraLATA toll dialing parity or interLATA service in accordance with the schedule set forth in § 312b(1). Under § 312b(2), the PSC cannot order Ameritech to provide intraLATA toll dialing parity until "the inter-LATA prohibitions [contained in the AT&T consent decree] are removed . . . ." We find the plain language of § 312b(2) dispositive. In light of this language, we further find unwarranted the PSC's conclusion that its orders requiring full intraLATA toll dialing parity somehow became effective again on May 2, 1996, when the interLATA prohibitions contained in the AT&T consent decree had not been removed.

The PSC also contends that the legislative history of § 312b supports its interpretation of this section. In ascertaining legislative intent, this Court may examine both the legislative history of the act and journals chronicling this history. *Jenks v Brown*, 219 Mich App 415, 418; 557 NW2d 114 (1996). In this case, what eventually became Act 216 was introduced in the Senate on October 5, 1995, as Senate Bill (SB) 722. As introduced, SB 722 contained only § 312a. On October 26, 1995, the Senate passed a substitute for SB 722, again containing only § 312a, which provided in full as follows:

> Sec 312a. (1) Effective January 1, 1996, if a waiver to the inter-LATA prohibitions has been granted for a specific service area and the service area has 2 or more providers of

local exchange service, the provider of basic local exchange service shall provide 1 + intra-LATA toll dialing parity within the service area that is subject to the waiver.

(2) Except as provided in subsection (1), *until the inter-LATA prohibitions are removed for providers of basic local exchange service, a provider of basic local exchange service is not required to provide 1 + intra-LATA toll dialing parity. If the inter-LATA prohibitions are removed, then a provider of basic local exchange service shall offer to other providers 1 + intra-LATA toll dialing parity.*

(3) All orders of the commission providing for 1 + intra-LATA toll dialing parity issued before January 1, 1996, shall remain in effect to the extent that they are not in conflict or inconsistent with this section. [Emphasis added.]

As indicated previously, the PSC has relied on the fact that the Legislature did not ultimately enact the italicized language as part of § 312a or § 312b as support for its contention that the Legislature did not therefore intend to inextricably link intraLATA dialing parity with interLATA relief.

However, after the Senate passed the substitute for SB 722 on October 26, 1995, the Senate then sent this bill to the House, which adopted a second substitute known as SB 722 (Substitute H-1). A November 3, 1995, legislative analysis explains that SB 722 (Substitute H-1) would amend the MTA, in part, to "[p]rovide for intra-LATA dial-1 parity under certain conditions."[30] This legislative analysis goes on to explain the conditions under which SB 722 (Substitute H-1) would provide for intraLATA toll dialing parity:

Currently, a federal consent decree dating from the breakup of American Telephone and Telegraph Co. in the

---

[30] House Legislative Analysis, SB 722 (Substitute H-1), November 3, 1995.

early 1980s prohibits certain local exchange service providers from offering *inter*-LATA toll service (long distance between local access and transport areas). The bill would provide that if those prohibitions were removed, the PSC would immediately order the providers of *intra*-LATA toll service to provide dial-1 parity to other providers (Dial-1 parity refers to the ability to make a toll call without having to dial an access code or extra digits if the caller chose a telephone company other than the local exchange carriers.) The bill would require the PSC to immediately take necessary actions to seek a federal waiver to allow the bill's dial-1 parity provisions to take effect (i.e., petition the federal court to lift the inter-LATA prohibitions).

The bill would provide for a phase-in of both intra-LATA dialing parity and the provision of inter-LATA toll service by a provider of basic local exchange service, by requiring those services be provided to 10 percent of customers within the same service exchange by January 1, 1996; to 20 percent by February 1, 1996; and so forth, so that by May 1, 1996, both would be in place for up to 50 percent of customers within the same service area. However, only the first step in the phase-in (10 percent by January 1, 1996) would apply if the federal prohibitions were not lifted or waived.

Further, effective January 1, 1996, if a waiver to the federal inter-LATA prohibitions had been granted for a specific service area where there were two or more providers of local service in operation, a provider of local exchange service would be required to provide dial-1 intra-LATA parity within that service area.

All orders of the PSC providing for intra-LATA dial-1 parity issued before June 30, 1996, would remain in effect to the extent that they were not in conflict or inconsistent with the bill's dial-1 parity provisions. Further, the intra-LATA dial-1 parity provisions would not apply to providers of basic local exchange service with less than 250,000 access lines.[31]

---

[31] See n 30, *supra.*

The November 3, 1995, legislative analysis explains that SB 722 (Substitute H-1) was a response to the PSC's orders requiring local carriers such as Ameritech to implement intraLATA toll dialing parity by January 1, 1996:

> In a related issue, some are concerned about the effect of a PSC order which would institute "Dial-1 parity" on January 1, 1996. "Dial-1 parity" would require that customer's [sic] be able to make a "short haul long distance call" (a call which originates and terminates within the same area code or LATA) without requiring the caller to dial a five-digit access number in order to access his or her long-distance company. The PSC order would require that a customer be able to access his or her long-distance carrier of choice for such calls simply by dialing 1 plus the phone number. It is argued by some that implementing dial-1 parity without also allowing local access companies, like Ameritech, to have access to long-distance markets at the same time would be unfair.[32]

Finally, the November 3, 1995, analysis describes the arguments for and against SB 722 (Substitute H-1), both of which acknowledge that the bill links the provision of intraLATA toll dialing parity with interLATA relief:

> ARGUMENTS:
> *For*:
>
>                    *          *          *
>
> The bill would link dial-1 intra-LATA parity for inter-exchange carriers, such as AT&T or MCI, with lifting of the inter-LATA toll service prohibitions on local exchange companies, like Ameritech or GTE. This would effectively negate the PSC's order to implement dial-1 parity on January

---

[32] See n 30, *supra*.

1, 1996. Until federal inter-LATA restrictions are lifted, local phone providers could maintain their advantage in the intra-LATA market, thus ensuring a level playing field. Linkage of these issues is imperative to protect Michigan companies and workers as competition is phased in.

*    *    *

*Against*:

The bill would block the implementation of dial-1 parity for intra-LATA telephone service which is scheduled for implementation by the PSC on January 1, 1996. Illinois and Wisconsin will both require that competition be introduced into the intra-LATA toll market by 1996. Michigan, however, under the bill, would set up a graduated implementation of dial-1 parity, only 10 percent of which would be mandatory, until such time as the Congress or the federal courts lift the prohibitions of a federal consent degree [sic] entered by some of the local exchange providers in the early 1980s.

There is no reason to allow the local exchange providers to continue their virtual monopoly on intra-LATA toll service. The local exchange providers do not need to have access to the long distance market in order to allow competition to flourish in the local market. The local exchange providers have all of the equipment and technology necessary to allow them to enter the long distance market as soon [sic] they are released from the restrictions on the consent decree. On the other hand, current long distance providers and others who wish to enter the local market will be unable to do so without using the facilities owned by the existing local exchange providers. This gives the current local exchange providers a significant advantage should both dial-1 parity and release from the consent decree occur at the same time.

*Response*:

The bill would require that the implementation of dial-1 parity be linked to removal of the restrictions against the local exchange providers which bar them from offering long distance service to their customers. The restrictions on these local exchange providers would prevent them from successfully competing with other providers who would

otherwise be able to offer customers both long distance and local service as a package, while the local exchange providers would be unable to offer long distance service. Allowing the other companies to have a head start would be unfair. Without linkage of dial-1 parity and release from the federal restrictions on the provision of inter-LATA toll service, new competitors in the local exchange market could "cream-skim" the most lucrative customers by offering a package of long-distance and local service, while the larger current local providers would be bar [sic] from offering a similar competitive package.

The bill's provisions would also have the effect of forcing the PSC to help to seek a waiver of the consent decree which currently binds Ameritech. By involving the PSC, the bill will hopefully help to speed the process of giving Ameritech the opportunity to compete on equal footing with the other companies.[33]

On December 27, 1995, the Senate completed a summary of SB 722, as enrolled.[34] The summary noted that SB 722, as enrolled, provided for "intra-LATA 'dial-1 parity' under certain conditions."[35] The summary recapitulated the intraLATA toll dialing parity provisions found in SB 722, as enrolled, as follows:

The bill requires that, effective January 1, 1996, a provider of basic local exchange service provide intra-LATA dial-1 parity within the service areas, if a waiver to the inter-LATA prohibitions is granted for a specific service area and the service area has two or more providers of basic local exchange service.

A provider of basic local exchange service must provide intra-LATA dial-1 parity and provide inter-LATA toll service to an equal percentage of customers within the same service exchange on the following dates:

---

[33] See n 30, *supra.*

[34] Senate Legislative Analysis, SB 722, December 27, 1995.

[35] See n 34, *supra.*

- To 10% of the customers by January 1, 1996.
- To 20% of the customers by February 1, 1996.
- To 30% of the customers by March 1, 1996.
- To 40% of the customers by April 1, 1996.
- To 50% of the customers by May 1, 1996.

Except for the 10% requirement on January 1, 1996, this requirement does not apply to the extent that a provider is prohibited by law from providing either intra-LATA dial-1 parity or inter-LATA toll service.

If the inter-LATA prohibitions are removed, the PSC must immediately order providers of basic local exchange service to provide intra-LATA dial-1 parity.

The bill's dial-1 parity provisions do not alter or void any PSC orders regarding dial-1 parity issued on or before June 1, 1995, nor do they apply to a provider of basic local exchange service with fewer than 250,000 access lines.[36]

Thus, contrary to the PSC's contention, we believe that the legislative history and analyses of § 312a and § 312b clearly indicate that, except for ten percent of customers, the Legislature intended to link intraLATA toll dialing parity to interLATA relief.

Finally, we note that in construing a statute, deference is given to an administrative agency's decision, provided that its construction is consistent with the purpose and policies of the statute itself. *Empire Mining, supra* at 416. In this case, the PSC found that its construction of § 312b was consistent with the policy of encouraging competition and new providers embodied in the MTA.[37] However, despite these general policies, the plain and specific language of § 312a and § 312b embodies an express policy choice indicating that, except for ten percent of customers, the Legisla-

---

[36] See n 34, *supra.*

[37] See, generally, MCL 484.2101; MSA 22.1469(101).

ture did not intend to encourage competition and new providers in the intraLATA toll dialing market to the extent that a local carrier is prohibited from providing interLATA service. Thus, the PSC's construction of § 312a and § 312b is inconsistent with the policies actually embodied in those sections.

In summary, we conclude that Ameritech has correctly interpreted § 312a and § 312b. *Attorney General, supra.* The plain language of, and policies embodied in, § 312a and § 312b, as well as the legislative history of these sections, clearly indicate that except for ten percent of customers, the Legislature intended to link intraLATA toll dialing parity with interLATA relief. Thus, we conclude that the PSC's interpretation of these sections is clearly wrong. *Attorney General, supra.*

B

We next consider the effect of the February 8, 1996, enactment of § 271 of the FTA on § 312a and § 312b.

Under § 271(a), a Bell operating company may provide interLATA service only as provided in § 271. Under § 271(f), post-February 8, 1996, federal court orders entered pursuant to the AT&T consent decree that remove the interLATA restrictions imposed on the Bell operating companies are superseded by § 271(a). Under § 271(e)(2)(A), a Bell operating company granted the authority to provide interLATA service under § 271 shall also provide intraLATA toll dialing parity. Finally, under the general rule stated in § 271(e)(2)(B), a state may not require a Bell operating company to implement intraLATA toll dialing parity before the earlier of the time when the Bell operating company is granted the authority under § 271 of the

FTA to provide interLATA service or February 8, 1999. However, in order to avoid the preemptive effect of this general rule, § 271(e)(2)(B) also provides a grandfather clause containing two exceptions whereby a state can order a Bell operating company to implement intraLATA toll dialing parity before the times otherwise specified in the general rule: "Except for single-LATA States and States that have issued an order by December 19, 1995, requiring a Bell operating company to implement intraLATA toll dialing parity . . . ." See, generally, 47 USC 271(a), (e)(2)(A) and (B), and (f); see also *Bell Atlantic, supra*; 141 Cong Rec, S 8348-8349 (daily ed, June 14, 1995).

In *Bell Atlantic*, the federal court construed the grandfather clause. In that case, the New Jersey Board of Public Utilities (BPU) issued an order on December 14, 1995, that approved both intraLATA toll dialing parity and the publication of proposed rules for the implementation of intraLATA toll dialing parity. *Bell Atlantic, supra* at 611. The rules were eventually adopted on August 5, 1996, including a rule providing that intraLATA toll dialing parity would be implemented on May 5, 1997. *Id.* at 612. Plaintiff Bell Atlantic, a Bell operating company, contended that the rule providing for implementation of intraLATA toll dialing parity on May 5, 1997, was preempted by § 271(e)(2)(B) of the FTA. *Id.* The BPU contended that because its December 14, 1995, order was "grandfathered" under § 271(e)(2)(B) of the FTA, "it [§ 271 of the FTA] has no impact on the implementation of that policy decision and these rules are thus unaffected by any provision in the [FTA]." *Id.*

The federal district court agreed, ruling that "[g]iven the plain meaning of the statute and the clear

mandate of the BPU Order, the BPU met the require-
ments of § 271(e)(2)(B) by issuing its December 14,
1995 order. Therefore, the implementation date of
May 5, 1997, will not be disturbed by this Court." *Id.*
at 616. In so ruling, the federal court stated:

> Simply put, the grandfather clause allowed those states
> who had initiated proceedings regarding [intraLATA toll dial-
> ing parity] and had ordered that [intraLATA toll dialing par-
> ity] would be implemented in that state to continue doing
> what they started and to utilize their own timeframes. . . .
>
> *          *          *
>
> More specific to this Court's inquiry, grandfather provi-
> sions which prevent preemption must not be given a nar-
> row construction. . . .
>
> *          *          *
>
> . . . All the grandfather clause to the Act requires is that a
> state determine whether it will proceed with [intraLATA toll
> dialing parity] and publish an order to that effect prior to
> December 19, 1995.
>
> *          *          *
>
> . . . There is a strong implication, then, that a state issu-
> ing an order before the December 1995 date would be free
> to actively implement [intraLATA toll dialing parity] at any
> time that state's public utility commission chooses. The
> issuance of the order *requiring* [intraLATA toll dialing par-
> ity] must have occurred before December 19, 1995, but the
> statute sets no deadline for the *implementation* of that
> requirement after the order has been issued.
>
> *          *          *
>
> . . . It is clear that actual implementation of a program
> was not required under the grandfather clause. The dead-
> line was based "on the states' issuing the order, not the
> effective date." [*Id.* at 613-615 (emphasis in original).]

Thus, *Bell Atlantic* makes clear that under the grandfather clause a state may proceed to actually implement intraLATA toll dialing parity after December 19, 1995, as long as the state issued the order providing for intraLATA toll dialing parity before December 19, 1995. In *Bell Atlantic*, the order under consideration was a state administrative order. In this case, we are considering § 312a and § 312b. The question thus arises whether state statutes can constitute an "order" under the grandfather clause. The word "order" is undefined in § 271(e)(2)(B) of the FTA. However, as explained in *Marcelle v Taubman*, 224 Mich App 215, 219; 568 NW2d 393 (1997):

> [S]imply because a phrase is undefined does not render a statute ambiguous. . . . Rather, undefined words are given meaning as understood in common language, taking into consideration the text and subject matter relative to which they are employed. . . . Where a statute does not define one of its terms, it is customary to look to a dictionary for a definition.

In considering the text and subject matter relative to which "order" is employed, we note that § 271(e)(2)(B) speaks in terms of "States that have issued an order . . . ." Black's Law Dictionary (6th ed) defines order, in part, as follows:

> A mandate; precept; command or direction authoritatively given; rule or regulation. . . . Direction of a court or judge made or entered in writing, and not included in a judgment, which determines some point or directs some step in the proceedings. [Citation omitted.]

We conclude that § 312a and § 312b constitute state orders for the purpose of the grandfather clause. Our conclusion in this regard is confirmed by a June 14,

1995, Congressional Record excerpt of a discussion by Senators Breaux, Graham, and Leahy concerning the grandfather clause.[38] We note that at the time of this discussion, the version of the grandfather clause under consideration provided for a June 1, 1996, cutoff date, rather than the enacted December 19, 1995, cutoff date:

> MR. GRAHAM: I briefly had an opportunity to look at the amendment. I asked for a copy to review it in more detail. Let me ask a question from the perspective of my State. The recent Florida legislature of this spring passed an interLATA dialing parity bill. The legislation goes into effect on January 1, 1996. What effect will this amendment have on my State's ability to adopt dialing parity?
>
> MR. BREAUX: I will respond to the Senator by saying that we have tried to take into consideration two types of States in our amendment. The first would be about 10 States that are single-LATA states, which means they only have one division of what can happen in their States. That does not include Florida. The second category includes Florida—except States which have issued an order by June 1, 1996, requiring this dialing parity, those States would be able to go forward with those orders, and they would be able to implement those orders. . . . But the State of Florida would be able to go forward with that order and implement it. In essence, the State of Florida would be grandfathered in because they are a State that already issued the order at the State level.
>
> MR. GRAHAM: Well, I am not certain if they have issued an order or not. My information is that the legislation goes into effect on January 1, 1996. I am not certain if that is the threshold that brings a State into the category [sic] those which will still be allowed to exercise some degree of State regulation over dialing parity.
>
> MR. BREAUX: My answer to the Senator from Florida is simply, yes. The explanation is that it is based on the States

---

[38] See *Bell Atlantic, supra* at 613-614.

issuing the order, not the effective date. The State of Florida, for instance, would have issued the order in a timely fashion in order to be one the excepted States.

MR. LEAHY: If the Senator will yield, the Senator from Louisiana is absolutely correct. Florida, having ordered it, even though they have not implemented it, would be covered by the Breaux-Leahy amendment and would be protected. [141 Cong Rec, S 8349 (daily ed, June 14, 1995).]

Thus, pursuant to § 312a and § 312b, Michigan issued an order by December 19, 1995, providing for intraLATA toll dialing parity. It is true that, except for ten percent of customers, actual implementation of intraLATA toll dialing parity was linked to interLATA relief. However, "all the grandfather clause . . . requires is that a state determine whether it will proceed with [intraLATA toll dialing parity] and publish an order to that effect prior to December 19, 1995." *Bell Atlantic, supra* at 614. The deadline is based " 'on the states' issuing the order, not the effective date." *Id.* at 615 (quoting 141 Cong Rec, S 8350 [daily ed, June 14, 1995]). Here, in enacting § 312a and § 312b, Michigan determined that it would proceed with intraLATA toll dialing parity and published an order to that effect before December 19, 1995. However, except for ten percent of customers, Michigan made a policy choice that linked the actual implementation of intraLATA toll dialing parity to interLATA relief. Thus, we conclude that § 312a and § 312b are within the grandfather clause because they constituted an "order by December 19, 1995, requiring a Bell operating company to implement intraLATA toll dialing parity."

C

The PSC's 1994 and March 1995 orders also constitute state orders within the grandfather clause. *Bell*

*Atlantic, supra.* The PSC's 1996 orders simply require Ameritech to comply with these orders. Thus, we next consider the effect of § 312a and § 312b on the PSC's 1994, March 1995, and 1996 orders.

The PSC's 1994 and March 1995 orders provide for intraLATA toll dialing parity. These orders further specify a schedule for the time when Ameritech must implement intraLATA toll dialing parity, i.e., on January 1, 1996, in those offices in which it was technically possible to convert to intraLATA toll dialing parity and thereafter pursuant to a firm conversion schedule for those offices in which it was not technically possible to so convert on January 1, 1996. However, effective November 30, 1995, the Legislature enacted § 312a and § 312b. Like the PSC's 1994 and March 1995 orders, these statutes also provide for intraLATA toll dialing parity. However, § 312a and § 312b differ from the PSC's 1994 and March 1995 orders in that the statutes provide a schedule different from that contained in the PSC's orders concerning when Ameritech is required to implement intraLATA toll dialing parity in Michigan. "To the extent that an administrative order conflicts with a statute, the order is void." *Manufacturers Nat'l Bank of Detroit v Dep't of Natural Resources*, 420 Mich 128, 146; 362 NW2d 572 (1984); see also MCL 484.312b(4); MSA 22.1469(312b)(4).

On the November 30, 1995, effective date of § 312a and § 312b, Ameritech was still prohibited by the AT&T consent decree from providing interLATA service. Thus, under § 312b(1) and (3), Ameritech was statutorily required to provide intraLATA toll dialing parity to only ten percent of its customers after January 1, 1996. Under § 312b(2), the PSC could not order Ameritech to provide full intraLATA toll dialing parity

until the interLATA prohibitions contained in the AT&T consent decree were removed. Moreover, under § 312a, Ameritech was not statutorily required to provide full intraLATA toll dialing parity for a particular service area unless a waiver to the interLATA prohibitions contained in the AT&T consent decree was granted and the service area had two or more local providers. Thus, we conclude that after November 30, 1995, the PSC's 1994 and March 1995 orders were rendered void to the extent that the intraLATA toll dialing parity implementation schedule contained in those orders conflicted with and continues to conflict with the statutory implementation schedules contained in § 312b, repealed effective July 1, 1997, and § 312a. MCL 484.2312b(4); MSA 22.1469(312b)(4); *Manufacturers Bank, supra.*

The PSC's 1996 orders required Ameritech to comply with the implementation schedule contained in the 1994 and March 1995 orders. Because we have determined that the PSC's previously ordered implementation schedule was rendered void because it conflicted with and continues to conflict with § 312b, repealed effective July 1, 1997, and § 312a, we conclude that the PSC's 1996 implementation compliance orders were unlawful or unreasonable. *Attorney General, supra.*

D

Ameritech also contends that this Court must reverse the PSC's imposition of a fifty-five percent discount on access charges. We agree. In the 1996 orders, the PSC ordered that Ameritech implement the fifty-five percent discount in those offices that did not convert to intraLATA toll dialing parity pursuant to the

schedule set forth in the PSC's 1994 and March 1995 orders. However, as previously explained, we have determined that the intraLATA toll dialing parity implementation schedule contained in the PSC's 1994 and March 1995 orders was rendered void to the extent that this schedule conflicted and continues to conflict with § 312b, repealed effective July 1, 1997, and § 312a. We have also determined that the PSC's 1996 orders requiring Ameritech to comply with the void implementation schedule were unlawful or unreasonable. Under these circumstances, we likewise conclude that the imposition of a fifty-five percent discount on access charges was also unlawful or unreasonable. *Attorney General, supra.*

E

Finally, Ameritech contends that this Court must reverse the circuit court's order of mandamus. We review the grant of a writ of mandamus for an abuse of discretion. *Rhode v Dep't of Corrections*, 227 Mich App 174, 178; 578 NW2d 320 (1997). However, the central issue involved in this appeal involved statutory interpretation, which is a question of law that we review de novo. *Id.* Having determined that Ameritech was not, and is not, required to comply with the PSC's unlawful or unreasonable 1996 orders, we also reverse the circuit court's order issuing a writ of mandamus.

F

In summary, as explained more fully elsewhere in this opinion, § 312a and § 312b come within the grandfather clause contained in § 271(e)(2)(B) of the FTA because these statutes constitute an order issued by Michigan "by December 19, 1995, requiring a Bell

operating company to implement intraLATA toll dialing parity." The intraLATA toll dialing parity implementation schedule contained in the PSC's 1994 and March 1995 orders was thus rendered void to the extent that this schedule conflicted with the statutory implementation schedule contained in § 312b, repealed effective July 1, 1997, and continues to conflict with the schedule contained in § 312a. In its 1996 orders, the PSC unlawfully or unreasonably required Ameritech to comply with a void implementation schedule and unlawfully or unreasonably imposed a fifty-five percent discount on access charges because of Ameritech's failure to comply with the void implementation schedule. We therefore reverse the PSC's 1996 orders. We dissolve the stay issued in Docket No. 198706. Finally, we reverse the circuit court's order of mandamus.

Reversed. Ameritech, being the prevailing party, may tax costs pursuant to MCR 7.219.