Markman, J.
Ameritech Michigan (Ameritech) appeals as of right an opinion and order of the Michigan Public Service Commission (mpsc), which finds that Ameritech sent a misleading and anticompetitive bill insert to its customers in violation of the Michigan Telecommunications Act (mta), 1991 PA 179, amended by 1995 PA 216 and 1998 PA 41, MCL 484.2101 et seq.\ MSA 22.1469(101) et seq. We affirm.
*25 The customer bill insert at issue in this case offered Ameritech’s customers protection against the practice known as “slamming,” whereby a customer’s preexisting choice of telecommunication service providers is changed without the customer’s authorization. Slamming has occurred most frequently in the interLATA long distance market,[1] where customers typically preselect or “presubscribe” one particular long distance provider to service all their long distance telephone calls made by ordinary “1+” dialing.[2] However, with the advent of provider presubscription and 1+ dialing parity for Michigan intraLATA calls, slamming can now also occur in the intraLATA long distance *26 market, as well as in markets for other telecommunications services where providers may be preselected by the customer, e.g., competitive markets for basic local exchange services.
Slamming can be prevented if the customer instructs the local phone company to make no changes in the customer’s presubscribed provider choices unless the customer directly requests the phone company to make the change, instead of allowing the customer’s newly selected provider to request the change on the customer’s behalf. The parties variously refer to this type of arrangement as “pic protection.”
In December 1995, Ameritech included an insert in its monthly telephone bills to residential and small business customers offering Ameritech’s PIC protection program, which program had been in effect for approximately ten years. The front of the insert contained the heading: “don’t get slammed,” followed by the following text:
You can stop unauthorized changes in your long-distance phone service. Please read and respond now to protect yourself.
The inside of the bill insert contained the following text:
Some phone companies are engaging in a practice commonly known as slamming: switching consumers’ long-distance or other telecommunications service without their knowledge or consent. This is an illegal practice on which the Federal Communications Commission has begun to crack down.
While Ameritech can do nothing to resolve the problem after your long-distance service has been slammed, we can easily protect you before it happens.
*27 Simply complete the information below and return this form, with your bill payment to ensure that slamming never happens to you. Upon receipt, Ameritech will not permit any changes to your account unless you notify us by phone or in writing of your desire to make changes. There is no charge to you for this service.
If you have any questions about slamming or your current phone service, please call us at 1-313-221-4455. [Emphasis in original.]
The remainder of the bill insert is a form with spaces for the customer’s signature, name, address, and phone number.
On February 14, 1996, Sprint Communications Company, L.P., filed a complaint against Ameritech with the mpsc, alleging that Ameritech’s bill insert was misleading and anticompetitive in violation of the mta and the Michigan Consumer Protection Act, MCL 445.901 et seq.) MSA 19.418(1) et seq. Other competing long distance providers, known as inter-exchange carriers or “ixcs,” i.e., AT&T Communications of Michigan, Inc., and MCI Telecommunications Corporation, subsequently intervened in the proceedings.
For the most part, the evidence before the MPSC focused on how Ameritech’s customers were likely to have interpreted the bill insert with regard to the services covered by the PIC protection program[3] and *28 whether Ameiitech’s motive in sending the bill insert out just before the January 1, 1996, intraLATA 1+ dialing parity conversion date in Michigan was to impede effective competition for its share of the intraLATA long distance market. In a 2 to 1 decision, the mpsc agreed with the hearing referee that the insert violated the mta but also held that the Michigan Consumer Protection Act claims were beyond its jurisdiction. Specifically, the MPSC found that the bill insert was misleading and deceptive under all the circumstances:
The Commission finds the bill insert to be deceptive and misleading. Just a few months before sending the bill insert, Ameritech Michigan had provided notice of the impending implementation of intraLATA dialing parity and used the terminology “intraLATA toll calling.” Exhibit 1-24, p 2. Ameritech conducted a media campaign a few weeks after mailing the bill insert to encourage those who have not done so already to request pic protection. It did not use the phrase “long-distance” service as the bill insert had used that phrase. It referred to “long-distance and/or local-toll service.” Exhibit 1-43, pp 4-7. Yet, in the bill insert, Ameritech Michigan used the term “long-distance” to mean inter- and intraLATA services. Furthermore, at the time customers received the bill insert, for almost all customers, the only service for which the provider could be switched, with or without the customer’s consent, was interLATA service. Customers could not presubscribe to an intraLATA provider and most did not have a choice of a local service provider. Therefore, the only kind of slamming that had any meaning to almost all customers was the slamming of interLATA service.
In that context, the definition of slamming inside the insert does not convey to customers that Ameritech Michigan intended the pic protection program to apply to all services. Rather, the definition is just that, an explanation of how the term can be used. For the better informed customer, Ameritech Michigan’s broader intent is even more obscure because the definition is followed by a statement *29 that the Federal Communications Commission (fcc) has begun to crack down on slamming and those customers would know that the fcc has jurisdiction over only interLATA services. Furthermore, all of the argument on the record about the meaning of “long-distance” misses the more basic point that there is no definition of long distance service that is broad enough to include local exchange service, which is also covered by the pic protection program.
The reference to not making “any” changes to a customer’s account without direct notification from the customer, coming at the end of the insert, does not provide clear notice to customers that the pic protection program described above only with reference to long distance service applies to local exchange service as well. In context, that language more clearly conveys that any change to long distance service requires direct notice rather than any change to any kind of service requires direct notice.
The bill insert is also misleading because it does not remind customers that Ameritech Michigan was required to implement intraLATA dialing parity for 10% of its customers on January 1, 1996 and that local service would soon be available from other providers. With that information, customers might have decided to wait to select another carrier and then to enroll in PIC protection. It may be too much to expect a competitor such as Ameritech Michigan to be that informative to its customers, but that does not render the bill insert any less misleading. It does suggest that Ameritech Michigan should not have sent the bill insert when it did, which raises the issue of the anticompetitive effect of the bill insert, discussed in the next section.
In addition, the bill insert is misleading because it states that “Ameritech can do nothing to resolve the problem after your long distance service has been slammed.” As Ameritech Michigan admits in its brief, “[t]he only remedy that can be provided by Ameritech once a customer has been slammed is to switch the customer back to his or her chosen carrier.” To a customer who has been slammed, being switched back to his or her chosen carrier is hardly “nothing.” It is true that slamming may well have consequences that switching back does not address, but the existence of *30 those other problems does not render the bill insert truthful. Rather, by falsely implying that the customer would be stuck with the carrier that slammed his or her account, Ameritech Michigan sought to create a sense of urgency to enroll in PIC protection just as intraLATA dialing parity was about to be offered to some customers.
For all these reasons, the Commission concludes that although customers who were very familiar with telecommunication terminology and regulation and who read the insert carefully and puzzled over its alternative meetings may have understood the full import of the language as Ameritech Michigan meant it, most customers would not have had that understanding. The insert is therefore misleading and deceptive.
The mpsc further found that the bill insert was anticompetitive in effect:
The Commission finds that the effect of the misleading bill insert is anticompetitive, in large part because of the timing, regardless of Ameritech Michigan’s motivation. In reaching this conclusion, the Commission accepts Ameritech Michigan’s view that the PIC protection program is not a “freeze” of a customer’s service providers. A customer is always free to authorize a change in providers. What the Commission does not accept is Ameritech Michigan’s assertion that the program is competitively neutral, especially when the bill insert was mailed just before intraLATA dialing parity was offered. It is anticompetitive because it created new hurdles to the exercise of the customer’s decision to change providers just as alternatives were becoming available.
Ameritech Michigan is simply wrong when it asserts that the pic protection program does not force the customer to make any extra calls or to take any extra steps to change his or her service provider. Without the protection in place, the customer can call a new service provider and make arrangements to take service, and the new provider can work directly with Ameritech Michigan to implement the change. With the protection in place, the customer must *31 contact not only the new service provider, but Ameritech Michigan as well. It is true that the contact can be by a transfer of the call at the conclusion of the contact with the new provider, if that contact occurs during Ameritech Michigan’s business hours and the customer remembers that he or she has pic protection, but even a contact by a transfer of the call involves staying on the telephone however long it takes Ameritech Michigan to respond. If the customer has forgotten requesting pic protection or misunderstood the scope of the protection, Ameritech Michigan will reject the new provider’s request to change the customer’s intraLATA or local exchange service provider. The new provider must then contact the customer, who must in turn contact Ameritech Michigan. No matter how it is characterized, PIC protection makes it more cumbersome for the customer to change service providers. There may be nothing wrong with that, even from a competitive point of view, if the customer clearly understands in advance the scope of the protection, what will be required to change providers in the future, and how soon competitive alternatives may be available. None of that was communicated by the bill insert. Consequently, the Commission finds that the effect of the bill insert is anticompetitive.
The bill insert, and pic protection, become even more anticompetitive if the interexchange carriers’ fears are justified that Ameritech Michigan will delay requests from customers to change providers and that it will use the contact as an opportunity to try to dissuade the customer from leaving Ameritech Michigan’s service. Ameritech Michigan denies any such intent, but that is no substitute for fully and fairly informing customers. Furthermore, as discussed above, there is ample evidence that Ameritech Michigan understood the bill insert to be anticompetitive and intended it to have that effect.
Furthermore, contrary to Ameritech’s [sic] Michigan’s argument, the fact that interexchange carriers have been able to market dial 1+ intraLATA service in those exchanges where that is permitted does not prove that the bill insert had no competitive effect. Without the bill insert, or PIC protection, they are likely to have won over even more custom *32 ers or at least to have been able to solicit new customers without the costs and delays that pic protection adds.
The MPSC reasoned that PIC protection constitutes a “term or condition” of providing telecommunication services regulated by the mta and, therefore, that Ameritech’s misleading and deceptive bill insert relating to that term or condition violates subsection 502(a) of the act, which provides:
A provider of a telecommunication service shall not do any of the following:
(a) Make a statement or representation, including the omission of material information, regarding the rates, terms, or conditions of providing a telecommunication service that is false, misleading, or deceptive. [MCL 484.2502(a); MSA 22.1469(502)(a).]
The MPSC also concluded that the misleading and anticompetitive bill insert constituted a “condition for” regulated telecommunication services, i.e., pic protection, in a manner that renders it adverse to the public interest by inhibiting informed decision making by customers and impeding the development of competition. Accordingly, the mpsc also invoked its authority under subsection 205(2) of the act, which provides:
If the commission finds, after notice and hearing, that the quality, general availability, or conditions for the regulated service violate this act or an order of the commission under this act, or is adverse to the public interest, the commission may require changes in how the telecommunication services are provided. The commission’s authority includes, but is not limited to, the revocation of a license and issuing cease and desist orders. [MCL 484.2205(2); MSA 22.1469(205)(2).]
*33 As a remedy, the mpsc ordered Ameritech to draft and mail a corrective bill insert (subject to premail review and approval by the mpsc) explaining to its customers the distinctions between the telecommunication services covered by the pic protection plan, the advent of competition in the provision of those services, the meaning of intraLATA presubscription, and the steps that are required to change providers with Pic protection in place, including the potential for delay in obtaining the services and prices of the new provider. The MPSC also ordered Ameritech to apply the Pic protection requested by customers beginning in December 1995 to interLATA service only and to refrain from applying pic protection requests to intraLATA and local exchange services until six months after mailing of the corrective insert, unless the customer has first affirmatively selected a provider of those services and then requested Pic protection. The MPSC further ordered Ameritech to permit customers with pic protection to change service providers by using the pic change verification procedures approved by the mpsc or the fcc, or through the use of three-way conference calls with the consent of the customer. Moreover, in the event a customer with Pic protection called Ameritech to change providers, Ameritech was not to use the call as an opportunity to attempt to dissuade the customer from doing so. Finally, the mpsc’s order directed the mpsc’s executive secretary to place a copy of the order in the mpsc case file used in the mpsc’s consultations with the fcc pursuant to the Federal Telecommunications Act of 1996 and to send a copy of the order to the Michigan Attorney General for review of possible action under the Michigan Consumer Protection Act.
*34 On appeal, Ameritech bears the burden of proving by clear and satisfactory evidence that the mpsc’s decision is unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8), MCL 484.2203(7); MSA 22.1469(203)(7); In re MCI Telecommunication Complaint (Ameritech Michigan v Public Service Comm), 229 Mich App 664, 681; 583 NW2d 458 (1998), lv gtd 459 Mich 878 (1998). A decision of the MPSC is unlawful when it involves an erroneous interpretation or application of law, and unreasonable when it is unsupported by the evidence. Id. Where, as here, an evidentiary hearing is required, any factual determinations made by the MPSC must be supported by competent, material, and substantial evidence on the whole record. Attorney General v Public Service Comm, 206 Mich App 290, 295-296; 520 NW2d 636 (1994).
Ameritech contends that the record lacks the requisite competent, material, and substantial evidentiary support for the mpsc’s determinations that the PIC program bill insert was misleading, deceptive, and anticompetitive. In this regard, Ameritech notes that its customer survey evidence was not controverted by testimony that any customer was actually misled and that the ixcs themselves did not present any customer surveys or other formal research indicating how customers actually interpreted the insert. Ameritech also objects that the record contains no “hard” or credible evidence that its bill insert had any actual anticompetitive effect and that the market-penetration data offered by Ameritech showed that the ixcs have, in fact, been highly successful in competing for intraiATA toll presubscription in the areas where intraLATA dialing parity has been implemented.
*35 We are ultimately unpersuaded by Ameritech’s objection to the lack of evidence showing that any of its customers were actually misled by the bill insert. It is an established principle, under both the common law and statutory trade regulation laws, such as the Federal Trade Commission Act (FTCA), 15 USC 41 et seq., that proof of actual deception is unnecessary to establish that advertising is unfair and misleading. Rather, it is sufficient to show that the advertising has the capacity to deceive. See, e.g., Carbonated Beverages, Inc v Wisko, 297 Mich 80, 84; 297 NW 79 (1941); Montgomery Ward & Co v Federal Trade Comm, 379 F2d 666, 670 (CA 7, 1967). For example, when the Federal Trade Commission determines whether advertising is unfair, deceptive, or misleading in violation of the FTCA, the commission is not obliged to rely on customer testimony or survey evidence, or any other kind of extrinsic evidence. Instead, the ftc may rely on its own common sense and administrative experience to assess whether the overall impression made by the advertising is expressly or impliedly misleading. See, e.g., Kraft, Inc v Federal Trade Comm, 970 F2d 311, 319 (CA 7, 1992); 54A Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices, §§ 1155-1157. If the FTC’s own evaluation of the advertising is reasonable, its findings may be considered supported by the requisite substantial evidence. Kraft, Inc, supra.
In view of federal law in this area, we find that the mpsc’s legal analysis here is not unreasonable and is, therefore, entitled to deference. Sullivan v Everhart, 494 US 83, 88-90; 110 S Ct 960; 108 L Ed 2d 72 (1990); In re MCI Complaint, supra at 681-682. An advertisement may be misleading or deceptive even though the *36 statements made are literally true, because of what is implied under the circumstances. Kraft, Inc, supra at 322. Advertising may also be unfair and deceptive if it omits information material to the customer’s assessment and reliance on the representations made. The mpsc here did not err in relying on its own expertise and common sense to determine that Ameritech’s bill insert here was false, misleading, of deceptive. See also Great Lakes Steel Div of Nat’l Steel Corp v Public Service Comm, 94 Mich App 694, 701; 290 NW2d 54 (1980), rev’d on other grounds 416 Mich 166; 330 NW2d 380 (1982).
Nor do we find that the mpsc’s application of the law to the instant facts was unreasonable. MCL 462.26(8); MSA 22.45(8). Ameritech’s bill insert contained language that is, at the very least, ambiguous with regard to the scope of and necessity for pic protection. For example, Ameritech’s statement that “Ameritech can do nothing” once a customer has been slammed seems to imply that the customer’s provider presubscription choice somehow will be irreversibly lost if the customer does not have PIC protection. Of course, that implication is false, because even without PIC protection, the customer can always have service switched back to the original carrier choice at any time. Ameritech makes much of the fact that this statement may be interpreted as literally true, because there are at least some consequences of slamming that the customer cannot avoid once slamming has occurred—in particular the inconvenience of having to contact the phone company to switch service back or having to reverse any billing consequences incurred before the unauthorized service was detected. Nevertheless, by saying that “nothing” can *37 be done, without further explanation or qualification, Ameritech’s insert seems to imply that there are no consequences of slamming that can be remedied afterward.
It is also important to note that, at the time Ameritech’s bill insert was sent out, its Michigan customers had only been presubscribing long distance carriers for their interLATA calls, although this was scheduled to change in the near future as a result of the MPSC’s orders requiring conversion to intralATA dialing parity in the state. Under these circumstances, it is reasonable to conclude that (1) customers were most likely to think of slamming in terms of their interLATA long distance service only, and (2) the fact that the offered pic protection would actually apply to customers’ intralATA service as well and that they would soon have the ability to presubscribe carriers for intralATA service was information that would have been material to the customers’ decision whether to choose Pic protection.
As noted by the mpsc, Ameritech’s insert did not expressly indicate that the pic protection would extend to intralATA service, either by using the technical term “intralATA” or more familiar terms such as “local long distance” or “local toll” service. Instead, the insert simply referred to “long distance,” which is an equivocal term that may be understood as applying to interLATA service only, as opposed to “local” long distance or toll calls. In light of this ambiguity, we are not persuaded by Ameritech’s observation that the term “long distance” is sometimes used as a generic term for both interLATA and intralATA service. Moreover, there is other language in the bill insert that arguably suggests the former meaning, i.e., interLATA *38 service only, such as the reference to the FCC, which has jurisdiction over interLATA calls only. Under the circumstances, we are not persuaded that the other language in the bill insert, such as statements that slamming could affect “long-distance or other telecommunications service,” and that PIC protection would prevent “any” customer account changes, was sufficient to dispel all notion that “long distance” meant interLATA service only.[4]
Ameritech also makes much of its customer survey evidence. However, the MPSC majority rejected the survey as self-serving and unrealistic:
The survey offered by Ameritech Michigan does not prove otherwise [i.e., that the effect of the bill insert was not anticompetitive]. More than 10 years after the breakup of the Bell system, there are still a significant number of customers who do not understand that Ameritech Michigan and AT&T are not the same company. Tr 168. Yet Ameritech Michigan asks the Commission to believe that 80% of its customers understand the distinction between inter- and intraLATA service and discerned the intended meaning of the language in the bill insert. The Ameritech survey is challenged as having fundamental flaws due to the nature of the questions, the tone of the interviews, and the people excluded from the sample. It is true that the challenges to the survey are offered by those with an interest in the outcome of this proceeding, but the survey was offered by a party subject to the same challenge. Consequently, the Commission, relying on its common sense and everyday experience, concludes that the bill insert was sufficiently misleading and deceptive that customers could not make an *39 informed decision about whether and when to sign up for pic protection.
We defer to the mpsc’s assessment of the credibility and weight to be accorded to this evidence.
As for Ameritech’s objection to the mpsc’s finding of an anticompetitive effect, despite evidence that the rxcs had gained market share during this period, we again rely, by analogy, upon Federal Trade Commission case law to address this issue, absent any contrary Michigan authority. Just as proving misleading or deceptive practices prohibited by the ftca does not require proof that any customers were actually deceived, the Federal Trade Commission is also not required to show any actual restriction of competition in order to establish that a practice has an unfair anticompetitive effect. See, generally, 54A Am Jur 2d, § 1162. Moreover, the use of false, deceptive, or misleading advertising is itself “unfair competition” within the meaning of the ftca, because a company that uses false or deceptive advertising has an unfair advantage over competitors who do not. Id.; Montgomery Ward, supra at 672. Accordingly, the mpsc’s interpretation of Michigan law, in our judgment, is reasonable and is, therefore, entitled to deference. Sullivan, supra; In re MCI Complaint, supra. Further, we believe that there is substantial evidence supporting the mpsc’s finding that the misleading nature of the bill insert supports the conclusion that the insert had an anticompetitive effect.
We decline to adopt the rule sought by Ameritech that would require competitors to prove the anticompetitive effect of false or misleading advertisements through actual market-share data. This would likely pose an impractical task for the mpsc because it *40 would require it to speculate regarding what the market-share data might have been in the absence of the false or misleading communication. For the same reason, we believe the mpsc reasonably rejected Ameritech’s proofs that the ixcs have been gaining intraiATA market share as an unavailing defense to the claim of anticompetitive effect, because there is no way of knowing whether the ixcs might have been even more successful, or might have been spared additional expense and effort, had the bill insert not been sent.
Ameritech’s objection that its PIC protection program itself is not anticompetitive but procompetitive misses the point. As the mpsc explained at the outset of its opinion, the issue in this case is the propriety of Ameritech’s bill insert, not the propriety of the PIC protection program or the merits of slamming in general:
[T]his case is not about whether slamming is unlawful or undesirable. It is both. This case is not about whether Ameritech Michigan’s PIC protection program is appropriate or reasonable. This case is not about the right of customers to choose to enroll in the pic protection program. This case is not about whether interexchange carriers have been guilty of slamming or have sought to implement PIC protection for their own benefit. This case is about whether Ameritech Michigan, a competitor in the intraiATA and local exchange markets, promoted its pic protection program through a bill insert that complies with the requirements of the law.
Ameritech next argues that the MPSC improperly allocated the burden of proof by requiring Ameritech to prove that its bill insert was “just and reasonable” and without anticompetitive effect, instead of placing the burden on the complainant and intervenors to *41 come forward with evidence of actually misled customers or actually impaired competition. We disagree. Ameritech’s argument is largely based on the following excerpt from the MPSC’s decision:
To prove that the bill insert was misleading, Sprint and the intervenors did not need to offer testimony from customers, just as Ameritech Michigan need not offer testimony from customers to prove that a proposal is just and reasonable. To prove that the bill insert was anticompetitive, Sprint and the intervenors did not need to offer testimony from expert witnesses. The ultimate issues in this case—whether the bill insert was misleading and anticompetitive—are not unusually complex and can be answered without resort to customer or expert testimony. They can be resolved by the application of informed common sense to the language of the bill insert and a consideration of its likely effects. The Commission therefore concludes that the [hearing referee] did not shift the burden of proof, or, put otherwise, the complainants and intervenors satisfied the burden that was theirs.
This passage does not indicate any improper shifting of the burden of persuasion to Ameritech. Rather, the passage plainly places that burden on the “complainants and intervenors.” At most, the passage merely alludes to a possible burden of production on Ameritech’s part to rebut the rxcs’ evidence with proof that its challenged actions were just and reasonable. See, generally, Kar v Hogan, 399 Mich 529, 539-540; 251 NW2d 77 (1976). In reality, Ameritech’s argument here is not so much about the allocation of the burden of proof as it is about the weight and sufficiency of the evidence. In this regard, Ameritech continues to object to the lack of evidence regarding actual customer deception or actual loss of market share. However, as we have already observed, we believe that *42 the mpsc’s decision in this case is consistent with analogous Federal Trade Commission jurisprudence in the area of deceptive and anticompetitive trade practices.
Ameritech next contends that the mpsc unlawfully refused to consider Ameritech’s confidential marketing information consisting of the company’s intraLATA toll market losses to competitors for the first three months following introduction of intraLATA dialing parity in portions of its service area. Ameritech’s argument is unavailing because the mpsc plainly indicated that its decision would have been the same even if it were to have considered and relied on Ameritech’s evidence. Any error in the mpsc’s reasoning that does not affect the outcome reached is harmless and does not amount to a violation of Ameritech’s due process rights. Feaster v Portage Public Schools, 210 Mich App 643, 655; 534 NW2d 242 (1995), rev’d on other grounds 451 Mich 351; 547 NW2d 328 (1996); Verbison v Auto Club Ins Ass’n, 201 Mich App 635, 641; 506 NW2d 920 (1993).
The mpsc’s analysis is reasonable, in our judgment. As we have already noted, proof that the ixcs have been gaining market share despite the effect of Ameritech’s bill insert is unavailing as a defense to the claim of anticompetitive effect, because there is no way of knowing whether the ixcs might have been even more successful had the deceptive bill insert not been sent. Similarly, Ameritech’s evidence that it has been losing intraLATA market share to the ixcs following conversion to intraLATA dialing parity is unavailing as well.
Ameritech next challenges the mpsc’s reliance on subsections 205(2) and 502(a) of the mta, arguing that neither its Pic protection program nor its bill insert *43 advertising PIC protection constitutes a regulated “telecommunication service” or “conditions” for or of any such regulated telecommunications service. We disagree. The term “telecommunication services” includes “regulated and unregulated services offered to customers for the transmission of 2-way interactive communication and associated usage.” MCL 484.2102(dd); MSA 22.1469(102)(dd). As the MPSC noted, this Court has interpreted “conditions” of regulated telecommunication services broadly to include arrangements that affect how regulated services, e.g., intraLATA toll service, are provided. GTE North, Inc v Public Service Comm, 215 Mich App 137, 154; 544 NW2d 678 (1996). In GTE, this Court was referring to the dialing arrangements necessary for access to intraLATA toll calling. Here, Ameritech’s PIC protection program is an arrangement or procedure, i.e., a “condition,” that affects how telecommunications services, such as intraLATA toll service, are provided to customers, by controlling changes of the provider of those services.
Of course, we recognize that, unlike dialing arrangements, the PIC protection arrangement is voluntary and optional, not mandatory and indispensable, but we do not believe this distinction makes the Pic protection procedure any less of a “condition” affecting the provision of regulated services than a mandatory dialing arrangement once the PIC protection program has been chosen and implemented. We also find the fact that the pic protection program is not a mechanical arrangement of telecommunications equipment, such as wires and switches, to be a distinction without a difference.
*44 As noted by the mpsc dissent, it is doubtful that the bill insert itself may be considered a condition for regulated telecommunications services for purposes of subsections 205(2) and 502(a) of the mta. However, the mpsc never held that the bill insert itself was a condition for service. Rather, the MPSC found the PIC protection program to be a condition for providing regulated telecommunication services, i.e., local exchange and toll services, and that the bill insert contained misleading and deceptive statements, representations, and omissions regarding that condition of service for purposes of subsection 502(a) of the mta. Under subsection 205(2), the mpsc concluded that the misleading and anticompetitive bill insert created a condition under which regulated basic exchange and toll services are offered that is adverse to the public interest because it prevents informed choices and impedes the development of competition. In effect, the mpsc determined that the bill insert adversely affected the availability of regulated basic exchange and toll services from competing providers.
We also reject Ameritech’s First Amendment challenge to the mpsc’s requirement of a corrective bill insert. False, deceptive, or misleading advertising is subject to restraint, and this is no less true when the finding of deceptiveness is supported by nothing more than the mere subjective “opinions of regulators.” See Kraft, Inc, supra at 319-321. Ameritech’s reliance on cases involving the regulation of truthful commercial speech is therefore misplaced. See also Mountain States Telephone & Telegraph Co v Dist Court, City & County of Denver, 778 P2d 667, 675-676 (Colo, 1989).
*45 Finally, Ameritech objects that it is unlawfully prejudiced by the mpsc’s decision to place a copy of the instant order in the case file used in the mpsc’s consultations with the fcc under the Federal Telecommunications Act of 1996 for the purpose of determining whether federal restrictions against Ameritech’s competing in the interLATA long distance market should be lifted. It also objects to the mpsc’s decision to provide a copy of the instant order to the Michigan Attorney General for consideration of possible action under the Michigan Consumer Protection Act. We disagree. Having found the mpsc’s decision in this case to be otherwise lawful and reasonable, we find nothing improper in the use of the mpsc’s decision—a matter of public record—for purposes of consultation and review in related legal matters.
Affirmed.

 Pursuant to divestiture of the Bell operating companies in the early 1980s, telephone service areas are divided into geographic regions, generally corresponding to telephone area code regions, known as local access transport areas or latas (there are five latas in the state of Michigan alone). Telephone calls between latas are known as “interLATA” calls, and calls that are sent and received within a single lata are known as “intraLATA” calls.

 The term “1+” dialing refers to a dialing arrangement whereby the caller need not dial a multidigit prefix code before dialing the number to be called in order to identify a particular long distance provider to service the call; instead, the caller need only dial a single digit prefix number (typically the number 1) before dialing the number to be called. For interLATA calls, callers may choose the long distance provider to service all their long distance calls made by 1+ dialing. This kind of provider “presubscription” allows for 1+ dialing parity for all competing long distance providers, i.e., the ability for any provider to service 1+ calls if preselected by the caller. However, it was not until the mid-1990s that the mpsc ordered conversion to 1+ dialing parity in the intraLATA long distance market in Michigan. Before conversion to intraLATA dialing parity, which was scheduled to begin January 1, 1996, all intraLATA calls made by 1+ dialing were serviced exclusively by the caller’s local exchange provider, e.g., Ameritech. Because of subsequent legislative changes, full conversion to intraLATA dialing parity has yet to occur in Michigan. See, generally, in In re MCI Telecommunications Complaint (Ameritech Michigan v Public Service Comm), 229 Mich App 664; 583 NW2d 458 (1998), lv gtd 459 Mich 878 (1998). When the bill insert at issue in this case was mailed, however, conversion to intraLATA dialing parity was scheduled to begin within a few weeks.

 Ameritech was the only party to offer a customer survey to establish how its customers may have actually interpreted the bill insert. Ameritech’s survey was taken of over one thousand of its customers in Michigan and in Wisconsin (where Ameritech’s bill insert was also sent). Of those customers who responded to the survey, eighty-one percent indicated that they understood that the pic protection program offered in the bill insert applied to intraLATA service, whereas only two percent indicated that they thought it would apply to interlata service only. Ameritech also presented evidence showing .its loss of intraLATA market share to its long distance service competitors.

 As noted by the mpsc, Ameritech’s bill insert also failed to mention the fact that carrier presubscription would soon be extended to intraLATA service in Michigan. This also might be considered an omission of a material fact relevant to the customer’s assessment and reliance on the bill insert.